FILED

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT JUL 19 PM 8: 17
MIDDLE DISTRICT OF FLORIDA

CLERK U S DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

E. Carl Anderson, as shareholder and as a
director of Medisys Technologies, Inc.,
individually,

      Plaintiff,

vs.                                Case No:  8:00 CV-905-T-24F

David Kiesel, Secretary of Medisys, and
Medisys Technologies, Inc.

      Defendants.
_____/

E. CARL ANDERSON'S
BRIEF IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

FACTS

On April 12, 2000 Anderson requested various corporate records in his capacity as a

Director of Medisys.  At the heart of his request were concerns and suspicions that

Defendants were taking official actions for Medisys without conducting actual Board

meetings, committee meetings, taking minutes and keeping customary corporate records of

corporate governance.  He suspected this was being done without notice to Plaintiffs.[1]

      In addition, Anderson had concerns that certain major transactions approved in prior

Board meetings were the result of inadequate consideration and may have involved self-

dealing by management and possibly other directors, particularly with respect to disposing of

_____
[1] Anderson affidavit, Exhibit 4.

1

14

substantial assets owned by Medisys. Records of all of these activities were requested in order to make a careful, studied assessment.[2]

Anderson requested records to determine when the legal relationship of Michael Ward, Esq. (and his co-counsel Fussell Jones) began with Medisys.[3]

These lawyers were ostensibly first hired on March 15, 2000 by Medisys to investigate a potential cause of action against Anderson and others. After formally hiring these lawyers, defendants then voted to delegate sole discretion to these lawyers whether to file a lawsuit. Within 24 hours these lawyers filed a 26-page lawsuit in the U.S. District Court for Louisiana. The nature of the lawsuit plainly indicated substantial prior preparation in behalf of Medisys was involved. Thus, these attorneys had undertaken substantial legal services to undertake this lawsuit for some time without any formal action by the Board.[4]

To investigate his suspicions that illegal Board meetings had occurred in the undertaking of this lawsuit, and that corporate funds were being authorized to pay for these services, Anderson made a request for copies of all minutes of any Board and/or committee meeting in which he was not in attendance. He also requested copies of the retainer agreements and legal billing records of two law firms.[5]

_____

[2] Anderson affidavit, Exhibit 4.

[3] Anderson affidavit, Exhibit 4.

[4] Anderson affidavit.

[5] Anderson attended all noticed Board meetings. Anderson was disconnected from one Board meeting he attended when the Board declined to permit a court reporter to transcribe the proceedings. The demand for a court reporter arose as a consequence of disputes over the accuracy of the minutes being reported by Defendant Kiesel. See Anderson affidavit Exhibit 4.

Defendant Kiesel responded that no Board meetings had been conducted in Mr. Anderson's absence and that Anderson had all such minutes. Kiesel further responded he had no minutes of any committee meetings. He refused to produce the requested records concerning the attorneys.[6]

Anderson requested investment publications used by Medisys to solicit stock sales and whether the purchasers of stock met requirements of law. In December 1998 Medisys had slightly over 30,000,000 shares issued publicly. By March 2000 this had increased to nearly 54,000,000 through the sales of restricted stock to many small investors. Anderson was well aware that Regulation D[7] restricted sales to "accredited investors" and that the nature of these sales suggested Regulation D was being disobeyed or circumvented. Furthermore, he was aware that Defendants Sutherland and Frey had a history of extremely poor performance in raising capital, and suspected they were involved stock sales in violation of Regulation D.[8]

Anderson requested copies of documents of a failed financing transaction with Bermuda International Capital Holdings. This financial proposal was developed by Defendants Sutherland and Frey. The proposal involved transferring significant assets of Medisys to strangers who appeared to give no consideration and other high risks to Medisys shareholders. Anderson sought the background documents to this past proposal to determine whether attempted self-dealing was involved. Anderson sought to ascertain whether

---

[6] Anderson affidavit, Exhibit 5.

[7] 17 C.F.R. sections 230.501-506.

[8] Anderson affidavit.

Defendants were involved in a scheme to transfer assets of Medisys to themselves. Anderson knew many of the defendants no longer held substantial stock holdings with Medisys due to their dilution of Medisys stock. As a result of these circumstances, Anderson wanted to revisit and study any failed major transfer of Medisys assets.[9]

Anderson requested background information on the approved Dispomedic deal. The Dispomedic contract paralleled in some respects the past failed financial deal with Bermuda International Capital Holdings. In the Dispomedic deal substantial property rights of Medisys were being transferred to a yet-to-be-created corporation. Aside from scant information, the state or nation of incorporation was unclear, the full ownership and ownership rights in this corporation were not revealed, and the details of corporate governance were not established. Without firm answers regarding these details, the opportunity to perpetrate a fraud upon the shareholders of Medisys was ripe.[10]

Anderson requested copies of all audit studies conducted by Medisys representatives of Phillips Pharmatech Labs, Inc.. Throughout 1999 and 2000 Phillips Pharmatech Labs, Inc. suffered financial reversals. Medisys had two opportunities to sell Phillips Pharmatech. Medisys sent Jerry Gardner to evaluate the operations (or so they were being told) so that Medisys could make appropriate decisions regarding how to solve the financial problems of Phillips Pharmatech. When Anderson made his request substantial discussions were under

---

[9] Anderson affidavit, Exhibits 4, 10.

[10] Anderson affidavit, Exhibit 11.

way toward a possible sale of Phillips Pharmatech. Anderson needed to know all of the details of this audit, as he was a Director of Medisys and a Director of Phillips Pharmatech.[11]

It was not until July 13, 2000 Anderson became aware that the "audit" of Phillips Pharmatech performed by Jerry Gardner and Medisys was actually a sham. Instead, it appears the audit was nothing more than a sub rosa investigation being conducted principally by Defendants Potter and Sutherland in order to justify a lawsuit against Anderson and others.[12]

Defendant Kiesel refused to produce any of the records requested. As a direct result, Anderson was unable to investigate the propriety of these activities and transactions.[13]

As a consequence of denying Plaintiff Anderson access to these corporate records, and through the uses of a fraudulent Proxy Statement and Annual Report[14], defendants had no effective opposition to securing sufficient proxies to elect a slate of directors proposed by their Proxy Statement. That slate excluded Plaintiffs. That slate excluded any candidates proposed by Plaintiffs at the March 15, 2000 Board meeting and at the May 10, 2000 shareholder meeting.[15]

---

[11] Anderson affidavit, Exhibit 4.

[12] On July 13, 2000 Defendant Kiesel's served an affidavit in support of a Motion to Dismiss upon Anderson's counsel. This affidavit attached "minutes" of the Board meeting of March 15, 2000. This was the first time Plaintiffs saw any such minutes. These minutes, for the most part, are pure fabrications. Some of the fabrication appears carefully contoured to defend conduct challenged by the original Complaint filed on May 2, 2000.

[13] Anderson affidavit, Exhibit 5.

[14] See Derivative Plaintiff's Brief in Support of Preliminary Injunction.

[15] Anderson affidavit; First Amended Verified Complaint.

These proxies were voted by Defendant Sutherland to elect himself, Kiesel, Frey, Potter, Andrus and diBenedetto as directors of Medisys.[16]

In view of the impossibility of issuing his own proxy solicitation, Plaintiff Anderson decided he could still oppose defendants by presenting his opposition to their slate to shareholders. Meanwhile, this suit was prepared.[17]

To accomplish this, however, Plaintiff Anderson needed the shareholders list. Plaintiff Anderson requested the shareholder's list from Defendant Kiesel on April 20, 2000 and informed Kiesel the purpose was to communicate with fellow shareholders consistent with the provisions of 17 C.F.R. Section 240.14a-2(b).[18] Anderson requested production of the list no later than April 28, 2000, which allowed Kiesel 5 business days to produce the records as required by law.[19]

In response, Defendant Kiesel delayed production using dilatory tactics, such as asking for payment without specifying the cost, and without stating when or where payment should be made. Plaintiff Anderson had to make repeated requests for these records. Thus he wrote Defendant Kiesel and defendants on April 28, 2000 specifically charging that Kiesel

---

[16] Anderson affidavit.

[17] Anderson affidavit.

[18] Anderson affidavit. 17 C.F.R. Section 240.14a-2(b) regulates communications of substantial shareholders in connection with proxies and relaxes certain proxy rules regarding communications by a substantial shareholder with others shareholders. Generally, the shareholder is permitted to inform others how he intends to vote on a matter being put to the shareholders.

[19] Utah Code, section 16-10a-1602(1) required production within 5 business days. Kiesel, Secretary of Medisys and a licensed lawyer, delayed access until late in the afternoon on May 1, 2000, a grand total of 11 days and a total of 4 days in excess of that permitted by law.

was deliberately delaying the list in order to assure the election of candidates proposed by defendants.[20]  Finally, in a letter to CEO Sutherland on May 1, 2000, Anderson warned he would sue to enjoin the results of the election if delays continued.  Shortly after CEO Sutherland received this warning, defendant Kiesel finally caused the shareholder's list to be faxed to Anderson.[21]

The list was faxed in the late afternoon of May 1, 2000.  It arrived less than 8 full calendar days before the scheduled shareholder meeting to elect directors.  Overall, Defendant Kiesel effectively delayed producing the shareholders list for 11 days.  In addition, the list was delivered 4 days after legally due.[22]

On or about May 5, 2000 Anderson was able to generate his first mailing to shareholders, which was followed with another mailing to shareholders on May 8, 2000.  Due to the extreme limits of time caused by defendants' delay, led by Kiesel and Sutherland, the first mailing was limited to those shareholders eligible to vote at least 20,000 shares.[23]

---

[20] Anderson affidavit, Exhibit 8.

[21] Anderson affidavit.

[22] Anderson affidavit

[23] Anderson affidavit.

**Plaintiff Anderson had an unqualified right to the shareholders list and the records requested, the denial of which impaired his ability to effectively perform his duties as a director and concomitantly eliminated his ability to oppose the candidacy of the slate of directors nominated by defendants.**

Section 16-10a-1602 of the Utah Code states, in part, "...a shareholder or director of a corporation is entitled to inspect and copy [corporate records], during regular business hours at a reasonable location specified by the corporation..." so long as the "...demand is made in good faith and for a proper purpose."

The Utah corporate records law is patterned after the Model Business Corporation Act the ("Model Act"). The Model Act imposes a "proper purpose" requirement when a shareholder or director seeks to inspect corporate records. Utah Code section 16-10a-1602(4)(a) defines a "proper purpose" as a purpose reasonably related to the demanding shareholder's or director's interest as a shareholder or director.

Section 16-10a-1602(6)(b) of the Utah Revised Business Act states the inspection statute does not affect the power of a court to compel production of corporate records for examination. This section is modeled after Section 16.02(e) of the Model Act. Section 16.02(e) provides that the right of inspection granted by the statute is an independent right and is not a substitution for, or in derogation of, rights of inspection that may exist as a "common law" right of inspection. Model Business Corporation Act Annotated, Section 16.02, 16-15 (1998/1999 Supplement). According to the official commentary to that section of the Model Act, section 16.02 "simply preserves whatever independent right of inspection" that may exist under the common law. Id. at section 16-16.

8

Although the Utah courts have not specifically addressed this issue, the courts of other states with similar, if not identical, statutory provisions have held that the statute is supplementary to, but does not supplant, the common law right of inspection.  See, e.g., Parsons v. Jefferson Pilot Corp., 426 S.E. 2d 685 (N.C. 1993); Johncamp Realty Inc. v. Sanders, 415 N.Y.S. 2d 192 (Sup. Ct. 1979).

In Tucson Gas & Electric Co. v. Schantz, 428 P. 2d 686 (Az. 1967), the court rejected the contention that the Arizona statute comparable to section 16.02 had superceded the common law and set forth the entire rights of a stockholder with respect to the inspection for corporate records.  After considering both the statutory and common law rights of inspection, the court held that since the legislature did not manifest a clear intent to repeal the common law right or declare the statutory right to be exclusive, a shareholder's common law right of inspection continued to exist independently of statute.

Any contrary interpretation of the Utah statute would create serious internal inconsistencies within the Revised Business Corporation Act.  For example, section 16-10a-801(2) of the Act provides,

> "All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors....."

Anderson rhetorically asks:  How can such a power effectively exist without meaningful access to corporate records?

Utah Code section 16-10a-840 imposes fiduciary duties upon corporate directors.  This section mandates directors (a) act in good faith, (b) with the care of an ordinarily prudent person in a like position would exercise under similar circumstances, and (c) in a

manner the director reasonably believes to be in the best interests of the corporation. Utah Code section 16-10a-840(3) provides that a director may not assert good faith as a defense if he has knowledge concerning that would make reliance upon the actions of corporate officers inappropriate.

Again, Mr. Anderson rhetorically asks: How can a Utah director discharge his duties without meaningful access to the corporation's records? How does a Utah director investigate illegal board actions, ultra vires actions, self-dealing and fraud without access to the corporate records......records controlled by the perpetrators being investigated?

In the face of the foregoing, Defendant Kiesel will, presumably, contend that directors are strictly limited to examining routine corporate records listed in Utah Code sections 16-10a-1601 and 16-10a-1602, regardless of the reason of the director's inquiry.[24] Such a limited inquiry would reveal nothing, in all likelihood, of matters such as self-dealing, fraud, illegal corporate action by rogue corporate directors, and managerial incompetence.

Directors, armed with a proper purpose, may access any and all corporate records in order to discharge their ultimate duties to the shareholders. That includes looking behind corporate minutes prepared by Defendant Kiesel and approved by his co-defendants.

The proper purpose requirement is met when a director seeks to communicate with other shareholders, Crane Co. v. Anaconda Co., 346 N.E.2d 507 (NY Ct. App. 1976) or desires to ascertain possible mismanagement. Riser v. Genuine Parts Co., 258 S.E. 2d 184 (Ga. App. 1979).

---

[24] Generally, those records are meeting minutes, accounting records and shareholder records.

In <u>Webb v. R.O.A. Gen., Inc.</u>, 773 P. 2d 834 (Utah Ct. App.  1989), the Utah Court of Appeals found that a shareholder's request for inspection for purposes of determining the corporation's true financial condition a "proper purpose." In <u>Smith v. Conley</u>, 279 S.E. 2d. 491 (Ga. App. 1981), the Georgia Court of Appeals, interpreted a statute similar to that found in Utah and held a proper purpose included an inspection to determine the performance of management, the condition of the company, and whether proper records were being kept.

The Illinois Court of Appeals, defined a "proper purpose" as one which sought to protect the interests of the corporation as well as the interests of the shareholder. <u>Weigel v. O'Connor</u>, 373 N.E. 2d 421 (1st DCA Ill. 1978).  A director's right of inspection is for a proper purpose when such right has been given "for the performance of his duties as such." <u>Hemingway v. Hemingway</u> 19 A. 766 ( Conn. 1890).  In New York  a director has an absolute and unqualified right to examine the books and records of the corporation, and such right is not affected by hostility between the director and the balance of corporate management. <u>Brenner v. Hart Systems, Inc.</u>, 493 N.Y.S.2d 881 (App. Div. 1985).

The proper purpose requirement exists in almost every jurisdiction and there is now a tendency to place the burden of proving improper purpose upon the corporation to defeat a demand for inspection rather than upon the shareholder to establish that his purpose is proper. <u>Bennett v. Mack's Supermarkets, Inc.</u>, 602 S.W.2d 143 ( Ky. 1979).

Mr. Anderson's records requests clearly met the "proper purpose" test of Utah Code, Section 16-10a-1602.  Utah common law holds that mandamus will lie to enforce the right whenever an inspection by the stockholder is necessary to protect the interests of the corporation or his own interests. <u>Kimball v. Dern,</u> 116 P. 28 (Ut. 1911).

Also, in relation to the anticipated shareholder's annual meeting, these requests if honored, would have permitted Plaintiff Anderson to report his findings of self-dealing, illegal board meetings and board action, and corporate mismanagement. Further, had Defendant Kiesel timely provided the shareholder's list to Plaintiff Anderson, timely, effective communications with shareholders could have neutralized, if not defeated outright, defendants' proxy solicitation.

Kiesel, and Defendants led by Kiesel and Sutherland, undercut Plaintiff Anderson's duties as a director, and his rights as a shareholder, to participate in the corporate democratic process. Defendant Kiesel's conduct assured the proxies solicited would be effectively unopposed.

**Plaintiff Anderson has proven he is entitled to issuance of a preliminary injunction setting aside the election of defendants as directors.**

In deciding whether an injunction should issue, the Court considers:

a. the substantial likelihood of success on the merits;

b. the threat of irreparable injury if the preliminary injunction is not granted;

c. whether such injury outweighs the harm that the preliminary injunction will cause to the opposing party; and,

d. whether the preliminary injunction is in the public interest. See GSW, Inc. v Long County, 999 F.2d 1508, 1518 (11th Cir. 1993) and Johnson v United States Department of Agriculture, 734 F.2d 774, 781 (11th Cir. 1984).

**a. Substantial Likelihood of Success:** The correspondence of Plaintiff Anderson clearly stated his purpose to Secretary-Director-Lawyer Kiesel. Anderson invoked a federal

proxy rule that relaxed the restrictions on a major shareholder when addressing a proxy matter. Thus, Kiesel knew Plaintiff was preparing to oppose the surprise Proxy Statement he issued. Kiesel's replies were clearly dilatory and certainly not grounds recognized by Utah code to delay production of the shareholders list.

While imposing delays upon Anderson, Kiesel and Sutherland were collecting votes as proxies solicited by their Proxy Statement began to return. In fact, defendants enjoyed up to 23 days to collect proxies before Anderson was finally able to put his written objections in a mailbox! And that was only a partial mailing.

Defendant Kiesel cannot show this Court any legal or moral justification for this conduct. Therefore, an injunction should issue.

**b. Threat of Irreparable Injury:** Irreparable injury has occurred. An election was procured by fraudulent and illegal means.

**c. Does the harm prevented by an injunction outweigh the harm that may be caused to the defendants?** The answer is yes. Defendants hold office by means of proxy fraud and election process fraud. Setting aside this election returns corporate governance to the status quo ante. That status still gives these defendants a majority to act in behalf of itself or the corporation.

By returning the status quo ante, and ordering new elections, the defendants are inconvenienced, but not prejudiced. Such an order permits Plaintiffs to meaningfully participate in the election process by submitting a shareholders' proposal, i.e., their own slate of directors, for election. Defendants' proxy fraud and election process fraud denied this legal right and opportunity to defendants. What's more, defendants knew as of March 10,

2000 that Plaintiff Anderson intended to invoke that very right if agreement on a slate of directors could not be achieved in the March 15 Board meeting.

Thus, the whole of their conduct was calculated to violate every franchise right held by Plaintiff Anderson. A new, fair election cannot reasonably prejudice the defendants whatsoever.

**d. Is the injunction in the public interest?** Yes. The statutes Plaintiff Anderson sought to invoke, only to be denied by defendants, are statutes drawn to assure fair corporate elections and to protect minority shareholders from predations of the majority.

Moreover, Medisys is a public corporation. It is not a banana republic operated by fiat by the likes of Kiesel and Sutherland. It is not the private venture for the sole use and benefit of defendants, regardless of the fact that members of this core group were instrumental in originally organizing Medisys. Those supposed rights ended when Medisys became a public corporation issuing stock for sale to the public at large.

The shareholders, the investing public, those who do business with Medisy and the public at large have an interest in fair and honest corporate elections. They have every right to know they are dealing with the lawfully elected directors, and not someone who holds office by means of fraud.

<strong>THE QUESTION OF BOND</strong>

The question of bond rests in the sound discretion of the Court. Bond may be waived if the party does not have the financial resources to post bond, <u>Crowley v Local No. 82</u>, 679 F. 2d 987, 1000 (1st Cir. 1982), rev'd on other grounds, 467 U.S. 526 (1984). Bond may be waived in order to not discourage enforcement of "public interests." <u>Van De Kamp v Tahoe</u>

14

Regional Planning Agency, 766 F. 2d 1319, 1325-1326 (9th Cir. 1985), overruled in part on other grounds, Rio Hondo v Lucero, 102 F.3d 445 (10th Cir. 1996).  The Court may balance the hardships on the parties.  Pharmaceutical Society v. New York State Department of Social Services, 50 F. 3d 1168, 1174-1175 (2d Cir. 1995), Temple v. White, 941 F. 2d 201, 219-220 (3rd Cir. 1991).  Bond may be denied where no substantial risk of harm is afoot. Doctor's Associates, Inc. v Distajo, 107 F. 3d 126, 136 (2d Cir. 1997), Americans United for Separation of Church and State v. City of Grand Rapids, 784 F. Supp. 403, 412 (W.D. Mich. 1990), rev'd on other grounds, 980 F. 2d 1538 (6th Cir 1992), Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F. 2d 1461, 1462 (10th Cir. 1987).

## RELIEF

Wherefore, Plaintiff Anderson requests the following relief:

1.  A preliminary injunction ordering:

    a.  a new election; and,

    b.  appointment of an independent inspector of elections to:

    (1)  supervise the proxy process to assure defendants do not usurp the rights of shareholders to submit proxies for their own nominees;

    (2)  to recover, count and certify any proxies solicited; and,

    (3)  to certified the election results.

2.  Entry of an order that no bond shall be required because of the public interest interests to be vindicated and because of the clear showing of the rights violated.

3.  An order compelling Defendant Kiesel and Medisys to deliver corporate records previously denied to Plaintiff.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Plaintiff Anderson's Brief in Support of Motion for Preliminary Injunction has been furnished by hand delivery to: Frederick Schrils, 400 North Ashley, Suite 2300, Tampa, Florida 33602 on the 19th day of July, 2000.

Thomas E. Spencer
FBN 0897159
19235 U.S. Highway 41 North
Lutz, Florida 33549
Tel: 813-949-6251
Fax: 813-949-9658

16